**TOWER CORPORATION v. MORRIS et ux.**

No. 13037.

Court of Civil Appeals of Texas. Dallas.

June 20, 1941.

Rehearing Denied July 25, 1941.

M. R. Irion and Touchstone, Wight, Gormley & Touchstone, all of Dallas, for appellant.

Martin B. Winfrey and Irving L. Goldberg, both of Dallas, for appellees. ·

BOND, Chief Justice.

This suit was brought by plaintiffs (appellees), Dr. I. J. Morris and wife, Dorsey Gibbs Morris, against defendant (appellant), The Tower Corporation, for an accounting of twenty per cent (20%) of net profits in excess of $25,000 derived from operation of the Tower Petroleum Building in the City of Dallas, for the year 1937. There is no controversy, as we see it, over the figures showing receipts and disbursements of revenue from operation of this building. The principal issue involved is the construction of the rental contract between the parties, in determining the amount of "net profits" on which appellees are entitled to twenty per cent (20%).

The ground upon which the Tower Petroleum Building stands is owned by Mrs. Morris. On March 1, 1923, she entered into a lease contract with Chain Stores Company, Inc., for a term of ninety-nine years, at a stipulated rental: For the first ten years, $30,000 per annum; for the next five years, $35,000 per annum; for the next five years, $42,000 per annum; and for the remaining seventy-nine years, $48,000 per annum. This leasehold was first conveyed to the Empire Realty Company, or McNeny & McNeny, a partnership composed of Frank and Fletcher McNeny; and, soon thereafter, the firm organized The Tower Corporation, with a capital structure of $200,000, including the leasehold assigned to it, valued for corporate purposes at $83,000. The Tower Corporation secured a loan of $750,000 from the Pacific Mutual Life Insurance Company; and Mrs. Morris, joined by her husband, subordinated her rentals and subjected her interest in the real estate to said loan, for the purpose of erecting a thirty-story office building, designated as the Tower Petroleum Building. In 1931, without any obligation or liability on the part of Mrs. Morris, the Corporation borrowed $53,000 from McNeny & McNeny to complete the building, executing a note to them for $156,000. This note embraced the $83,000, value of the leasehold owned by McNeny & McNeny, and the loan of $53,000, plus $20,000 past due and unpaid interest. On June 30, 1933, the Corporation, being unable to meet its fixed charges, that is, rentals, interest, insurance, management salaries, and operating and maintenance expenses, and to establish or set aside necessary reserves to pay taxes and interest maturities, made a supplemental lease agreement with Mrs. Morris and the Pacific Mutual Life Ins. Company, whereby the rentals due to Mrs. Morris were substantially reduced, and the interest payable on the bonded indebtedness due to the Insurance Company was lowered, and an amortization allocation of $25,000 was agreed to be set aside to pay on the principal of said bonds. The supplemental lease contract is the gravamen of this controversy. It reads (material here) as follows: "Second: Whenever and as often as, during any continuous twelve months ending June 30th in any year or years, there shall be realized by Lessee from the operation of the leased premises net profits (after paying all rentals, proper operating and maintenance expenses and charges, management salaries, taxes, insurance charges and other proper charges, and after paying interest charges upon any balance then unpaid or all of Lessee's $750,000.00 of bonded indebtedness now owing if all be unpaid, and after setting up necessary reserves) sufficient to justify the payment by Lessee of more than $25,000.00 upon the principal of its aforesaid bonded indebtedness, such excess net profits remaining after paying said sum of $25,000 shall be applied and paid out by Lessee as follows: (a) Fifty per cent (50%) thereof as an additional payment upon Lessee's aforesaid bonded indebtedness, so long as such indebtedness, or any part thereof, in its present form or otherwise, remains unpaid; (b) twenty per cent (20%) thereof upon the principal sum owing by Lessors upon their mortgage indebtedness in the principal sum of $170,000.00

to the Pacific Mutual Life Insurance Company, already secured upon a certain portion of the lands of Lessors in Block 94 in the City of Dallas, Texas, included in this lease, so long as such mortgage indebtedness, or any part thereof, in its present form or otherwise, remains unpaid: (c) thirty per cent (30%) thereof as Lessee may determine."

On March 29, 1937, by further supplemental agreement of the parties, the $25,000 set aside to amortize the bonded indebtedness of $750,000 was made payable to the lessors, for a period of two years only, beginning January 1, 1937; and it provided that at the close of any twelve months' period ending June 30, the lessors were granted the right to select a certified public accountant to audit and examine lessee's books, to determine the net profits apportioned under the contract. This was merely permissible.

During the year 1938, the lessee stated its account and furnished lessor a written report showing in detail receipts and disbursements of all revenues received from the leased premises for the year 1937, as follows:

| | | |
|---|---|---|
| To Gross Income | | $206,874.67 |
| ( 1) | By operating expenses | $54,965.21 |
| ( 2) | Uncollectible rentals (prior to 1937) | 5,935.27 |
| ( 3) | Alteration and expenses (prior to 1937) | 4,429.55 |
| ( 4) | Life insurance premiums.. | 142.35 |
| ( 5) | Donations | 481.00 |
| ( 6) | X'mas bonuses | 632.50 |
| ( 7) | Dues and subscriptions | 143.00 |
| ( 8) | Donations | 450.35 |
| ( 9) | Interest (McNeny note) | 4,453.83 |
| (10) | Interest (Pacific Ins. bonds) | 33,342.68 |
| (11) | Gen'l. Adm. expenses | 65,555.33 |
| (12) | Reserve for deprec. and amortization | 33,196.26 |
| | | 203,727.33 |
| Net Profits | | $ 3,147.34 |

Plaintiffs hinged their suit on the account stated, without exercising their right to audit the books from which the account was compiled; challenging certain items deducted by defendant in arriving at the net profits. Briefly, the petition alleges that defendant, during the calendar year 1937, realized, under the aforesaid supplemental lease contract (evidenced by the account rendered and attached to plaintiffs' petition), sufficient "net profits" to entitle plaintiffs to $7,247.76; therefore, sought judgment. The defendant answered merely by general demurrer and general denial.

On trial to a jury, at conclusion of the evidence, the court gave an instructed verdict in favor of plaintiffs, for the sum of $4,602.29; accordingly entered judgment. This sum is made up of 20% of the excess net profits; that is, the sum remaining after the $25,000 was paid to lessors out of the profits for the year 1937, less $1,000 paid to plaintiffs during the year. The net profits were found by the trial court to be $28,011.45; made up of the items of $3,147.34 (net profit shown in defendant's stated account), plus the following challenged items: (1) Uncollectible rentals (prior years to 1937), $5,935.27; (2) alteration expenses (prior years to 1937), $4,429.55; (3) life insurance premiums, $142.35; (4) donations and contributions, $931.35; (5) X'mas bonuses, $632.50; (6) dues and subscriptions, $143; (7) interest (McNeny note), $4,453.83; (8) reserve for depreciation ($33,196.26 less amortization of loan, $25,000) $8,196.26. These specific items were found by the court to have been deducted outside the terms of the contract, therefore, not allowed in determining the net profits; otherwise, the account was allowed.

█ The propositions urged by defendant for reversal will not be considered in detail, or in the order presented, but the material questions for determination of the appeal will be discussed. In the absence of pleadings and proof to the contrary, we must assume that the stated account sued upon represents a true and correct statement of the receipts and disbursements of revenues derived from the operation of the building for the year 1937; so, we shall only consider whether the controversial items in the account are deductible charges under the aforesaid provision of the lease contract.

█ It might be said at the outset, there is sufficient testimony in the record to sustain a finding of fact that the controversial items, as stated in the account, are deductible charges, measured by the usual practice of accountants in arriving at clear gain of corporations. No good purpose would be served in discussing here the various definitions of the term "net profit," as applied generally in the conduct of a business, or as measured by accountants' practice. "Net profits" from receipts and disbursements, as set forth in the contract between the parties, do not mean the clear gain of the corporation after deducting from its total receipts all proper charges usually recog-

nized by accounting practice. The deductible charges in this case are fixed by contract; therefore, the question is, whether the contract authorized the defendant to deduct from receipts for the year in question, charges and losses which ordinarily and usually are deductible in ascertaining the gain or loss of such business.

 It is evident, we think, that the clear gain or profit of a corporation, measured by the usual standard employed by accountants, is entirely different from that measured by the terms of this contract. The contract expressly limits the accountable "net profits" to revenues realized from the building "during any continuous twelve months ending June 30," *after paying* all rentals, proper operating and maintenance expenses and charges, management salaries, taxes, insurance charges, *other proper charges,* and interest charges on the bonded indebtedness of $750,000; *"after setting up necessary reserves."* It is conceivable that any item enumerated in the contract and "any other proper charge" not specifically enumerated, including other species of the same genus, paid by the lessee during any twelve months prior to June 30, are proper deductible charges. However, the charges deductible must be such as were *paid or payable out of a reserve allowed to be set up* from revenues for the accountable year. Manifestly, the contract does not permit a construction which would allow items wholly unrelated, or of an entirely different species from those enumerated in the contract. The particular classes of deductible items mentioned in the contract are limitations on the general words "other proper charges". If the contracting parties had intended the general words to be used in an unrestricted sense, they would have made no mention of the particular classes of deductible charges. The contract takes into consideration, in determining accountable net profits, any "continuous twelve months ending June 30th." Therefore, any item which may reasonably be classed as operating and maintenance expense and charge, not specifically mentioned among the enumerated items, and which was paid or payable during the accountable year out of the revenues for that year, or any reserve set up to pay such item thus created, must be considered deductible in determining the profits to be apportioned.

[5] With reference to the aforesaid first and second items disallowed by the trial court (uncollectible rentals and alterations on the building), the record shows that these were not paid, or payable, out of revenues from the leasehold for the year 1937. In fact, the uncollectible rentals ($5,935.27) were never paid out by the Corporation, but represent long past due and uncollectible rentals which had been charged to tenants occupying space in the building for many years prior to 1937. These rental charges were carried on the books of the Corporation, and were merely declared uncollectible in 1937. Such is also true of the alteration item of $4,429.55. The alterations in the building were made to accommodate tenants and were contracted, constructed, and paid for many years prior to 1937. No part of the item was paid out of the revenues received from the leasehold during the accountable year, as shown in defendant's stated account. Manifestly these items do not come within the deductible class allowed under the contract. It may be true, as stated in the record, that on the books of the Corporation, the aforesaid items were carried as accrued rentals and the value of the alterations shown on the books as assets of the Corporation; and, to offset such book assets, the uncollectible rentals and alteration expenses for prior years are proper charges in arriving at the gain or loss of the Corporation. If the contract had not defined net profits, there might be some plausibility in allowing such items; otherwise, there is none.

 With reference to the third item (life insurance premiums), the evidence shows that the Corporation, in order to induce various insurance companies to move into the building, and others to refrain from moving out, took out life insurance on its employes, losses payable to the Corporation; and premiums therefor were paid during the accountable year. It is in evidence that such tenants would not contract for floor space in the building without such patronage. So, in order to secure and retain such tenants, collecting the rents paid by them, which were accounted in the gross income for the year 1937, we think the item of $142.35 (premiums paid) is tantamount to a reduction or loss in rents paid by such tenants, and that such premiums are proper deductible items in the account. Also as to item five (Christmas bonuses), the evidence shows that the sum of $632.50 was paid to employes of the Corporation as salary increase; hence such item is deductible under the contract.

■ With reference to the fourth item (deductions and contributions), the evidence shows that the Corporation contributed out of its revenues during 1937, $300 to Southern Methodist University, Dallas, Texas; $300 to Community Chest, a charitable institution of Dallas; $100 to the National Red Cross; and $231.35 to miscellaneous charities. These items undoubtedly are worthy contributions and the evidence shows they are usually and customarily made by business concerns. Such is also true of item six (dues and subscriptions): The Corporation subscribed and paid dues in the sum of $75 to Dallas Chamber of Commerce; $50 to Petroleum Club, a social organization located in the building; and $18 to Dallas Rotary Club, a social luncheon club. These items were attractive contributions to tenants, tended to popularize the building, and make it more inviting to occupants; and were usual and customary deductible items in the conduct of business enterprises. However, it will be seen that there is nothing in the contract authorizing such items to be accounted deductible charges in determining the net profits.

■■ With reference to item seven (interest paid on the McNeny note), the contract in question provides that only one item of interest is deductible; that is, the interest on the bonded indebtedness due Pacific Mutual Life Ins. Company. "The expression in a contract of one or more things of a class implies the exclusion of all not expressed, even though all would have been implied had none been expressed." 17 C.J.S., Contracts, § 312, p. 730. It is conceivable that, had the contract not specifically expressed the deductible interest on the bonded indebtedness in determining net profits, the interest on the note due McNeny & McNeny might, and perhaps would be deductible. Obviously, the interest paid on the McNeny note ($4,453.83) is a proper deductible charge to show gain or loss of the Corporation. It was a deal of the Corporation in which the lessors were not concerned. Such, however, does not come under the limited term "net profits" involved here.

With reference to item eight (reserves for depreciation and amortization): This item, as shown by the stated account, is the largest enumerated. The amount exceeds the annual leasehold rentals payable to Mrs. Morris; also the taxes and insurance. The reserve for depreciation is not a payment; it is not a debt or charge against the Corporation; it is neither mentioned, nor does it come within the purview of the enumerated deductions of the contract. The terms of the contract, permitting the lessee to deduct payments of "other proper charges," and of taxes, insurance and interest on the $750,000 bonded indebtedness, "after setting up necessary reserves," imply only a reserve for payment of specific deductible items enumerated in the contract. Taxes, insurance and interest on the named indebtedness mature annually at stated times, thus a reserve was deemed necessary to be set up to pay such items at dates of maturities. These debts were accountable and payable, and the contract expressly permits such payments "after setting up necessary reserves" therefor; therefore, we think, excludes the idea that a reserve shall be set up and deducted for any other purpose. This idea is further reflected in letters shown in the record from McNeny & McNeny, of date May 3, 1933, written on behalf of the Corporation, to Mrs. Morris, seeking to have her enter into the supplemental contracts in question. The letter, enumerating prior losses to the Corporation in the operation and maintenance of the building, recited: "In addition to the above loss, we were unable to establish our tax and interest reserve for March because of a lack of funds, and therefore this reserve is depleted to the extent of $5,656. This was occasioned by the necessary tax payments and the further fact that we were unable to begin last year's monthly reserves for taxes and interest until April." Then, following this letter, in furtherance of the suggestion made, on June 30, 1933, the aforesaid supplemental contract was entered into, allowing a setup for reserve.

■ Furthermore, the contract specifically allows $25,000 allocation to amortize the bonded capital structure of $750,-000; therefore, we think, such allowance, too, refutes the idea that an additional sum of $8,196.26 was intended to be set up annually during the entire life of the lease, for depreciation of the building. The general words "other proper charges" and "necessary reserves," following the enumerated items, cannot be construed to allow a substantial deduction for amortization of the structural indebtedness, and another large deduction for depreciation of the building. Depreciation might have been implied except for its exclusion by the

660

enumeration of permissible deductions. Specific provisions always control general provisions.

In view of what has been said, the amount of excess net profits, found by the trial court to be $28,011.45, is reduced by allowing the deductible items,—Christmas bonuses of $632.50, paid by the Corporation to employes as salary increase for the year 1937, and life insurance premiums of $142.35; accordingly, the judgment of the court is likewise reduced by 20% of such deductions. As reformed, the judgment is affirmed, for the sum of $4,447.32. The items of deduction being comparatively small, all cost is taxed against appellant.

Reformed and affirmed.